**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*
PEGGY RYAN,

       Plaintiffs,

                                       Case No. 05-cv-3450

v.

ENDO PHARMACEUTICALS, INC.,

       Defendants.

---

**DECLARATION OF PEGGY RYAN IN SUPPORT OF**
**MOTION FOR RELATOR SHARE AWARD**

---

       I, Peggy Ryan, do hereby declare and state:

       1.      I am the individual relator named in the above-captioned action.

       2.      My understanding is that the relator's share award is measured by whether I made a "substantial contribution" to the recovery of the case. As described herein, my efforts and those of my counsel substantially contributed to the government recovering $192.7 million from Endo Pharmaceuticals ($137.7 million to the federal government, $34.2 million to the state governments, and $20.8 million in criminal penalties). Endo also entered into a deferred prosecution agreement for one count of criminal misbranding, and a five-year Corporate Integrity Agreement. I did everything that was asked of me and everything that I could think to do to move the case forward for almost nine years.

**BACKGROUND**

       3.      By way of personal background, I have a Bachelor of Science degree from Xavier University's Cincinnati College of Mortuary Science in Cincinnati, Ohio. I am married and have lived in Syracuse, New York with my husband for 15 years.

1

4.      I began working in pharmaceutical sales in March 1998, following two years of working for Pitney Bowes selling office supplies.  I worked as a Sales Representative for Johnson & Johnson's Janssen Pharmaceutica from March 1998 to September 1999, and as a Senior Sales Specialist at Pharmacia Corporation from November 1999 to January 2002.  At Janssen, I was responsible for promoting Propulsid and Sporanox, both of which had "black box" warnings" due to having serious or life-threatening adverse effects.  Because of the "black box" status, the sales representatives were very strictly regulated about marketing the drugs for anything other than their approved indications.

5.      I began working for Endo Pharmaceuticals in April 2002 as a Specialty Sales Representative managing the Upstate New York territory, specializing in the anesthesia, neurology, physical medicine/rehabilitation and oncology marketplace.  In 2003, I was awarded the National IMPACT Award (recognizing sales professionals in the top 25% nationally who represent the Endo ideals of "innovation, mastery, productivity, accountability, challenge, and taking ownership), and finished second in the nation among Endo's Lidoderm sales force.  From 2003 to 2005, I was selected to represent Endo at the following national conferences: American Headache Society (Scottsdale, AZ); American Academy of Neurology's Annual Meeting (San Francisco, CA); Nurse Practitioner Association – Syracuse Chapter (Syracuse, NY); American Society of Regional Anesthesia and Pain Medicine Conference (San Diego, CA).  In January 2005, I was chosen to become a Field Trainer for incoming Endo specialty representatives, which included training new sales representatives through ride-alongs, coaching, and overall evaluation.  Also in January 2005, I was awarded the "Japan Rising Sun" award, which was determined by district managers and upper management selecting from the top specialty sales representatives.  As a result, I was the U.S. Specialty Sales Force representative on an all-

2

expense paid trip to Lidoderm's manufacturing plant in Kagawa, Japan, in April, 2005.  In June

2005, I was selected to become a specialty advisory board consultant, which role included

providing direct marketing and sales feedback and communication with Endo's Senior Director

of Specialty and Hospital Sales, Larry Romaine.

6.      My awards and acknowledgements by Endo continued even after I filed my False

Claims Act case and began working as an undercover informant for the Government.  In 2006

and 2007, I was chosen to represent Endo at the American Academy of Neurology meetings in

Boston, Massachusetts.  Also in 2007, I achieved the "Regional IMPACT Award" recognizing

top sales performers in the Upstate New York region.  In 2010, I was one of two representatives

awarded with a second trip to Japan where we visited Tokyo, Gifu, Nara, and Kyoto.  This award

was called the "Ever Shining Sun Award" and was one of the highest and most sought-after

recognitions in the company.

7.      I remained employed with Endo Pharmaceuticals from April 2002 until

November 2013.  I went on an extended leave of absence in late May, 2012, when I began

suffering from symptoms such as generalized weakness, malaise and constant migraines.

Ultimately, I was diagnosed with chronic Lyme disease.  As a result of my illness, I had no

choice but to resign from my position at Endo Pharmaceuticals effective November, 2013.

**PRE-FILING RESEARCH AND INVESTIGATION**

8.      I had been in the pharmaceutical industry for nearly four years prior to joining

Endo Pharmaceuticals.  Through my experience with my previous employers, I gained a

professional understanding of the industry and adopted a personal standard of integrity for

communicating to the medical community the correct and legal usages for the drugs I

represented.  Shortly after I began working at Endo Pharmaceuticals, I began to feel that Endo

was very different from my previous experiences at Janssen and Pharmacia.  Janssen and

Pharmacia had always been very strict about our sales practices, but I felt that Endo had a

general corporate culture of selling their drugs indiscriminately.

9.        Some of the initial issues that raised red flags to me were:

•        My extremely high (and rising!) sales goals which did not reflect the very

small, stagnant post-herpetic neuralgia ("PHN") marketplace for which Lidoderm

was solely approved.  When I started with Endo in 2002, my monthly Lidoderm

sales goal was 300 prescriptions.  At the highest point in 2004, my monthly sales

goals exceeded 2,000 prescriptions per month.

•        My designated call plan specialties included neurosurgery, rheumatology,

orthopedic surgery, pain management, physical medicine and rehabilitation,

dermatology, psychiatry, neurology, and anesthesiology.  None of these

specialties would ordinarily treat patients for PHN, so the only reason I could

market Lidoderm to them would be for an off-label use.

•        My first Endo training manual included the 2002 "Business Plan" which

had a goal to grow Lidoderm sales by 77% versus 2001.  The primary campaign

was two-fold.  There were a variety of brochures and pamphlets that encouraged

the reader to "Put the Patch Where the Pain Is."  The literature was coordinated

with a steady and consistent method during conversations with call plan list

providers to sell Lidoderm for "neuropathic pain" rather than the specific PHN

indication.

•        In the second quarter of 2002, Endo mailed out 40,000 copies of a

"restricted material" reprint of a study called, "Topical Lidocaine Patch Relieves a

Variety of Neuropathic Pain Conditions: An Open-Label Study." The study, which we called the "Galer-Devers study" after the authors' names, involved only sixteen patients, but purported to find that Lidoderm was effective for eight different types of neuropathic pain other than PHN, including neuroma (stump) pain, post-mastectomy pain, and intercostal (rib) pain. Even though Endo claimed the study was done by a third-party, the lead researcher was hired by Endo the same month that the study was published.

- The Galer-Devers study was provided to the sales representatives to distribute, in addition to about fifteen other off-label studies including chronic low back pain, osteoarthritis, and diabetic neuropathy. By giving us so many different studies, Endo's management and trainers were pushing sales representative to claim that the possible applications for Lidoderm were endless.

10. In June 2004, I heard about an agreement where a pharmaceutical company called Warner-Lambert pled guilty and entered into a $430 million settlement for the off-label promotion of Neurontin. This was a very consequential ruling which reverberated across the industry. As I spoke to other pharmaceutical reps and investigated the Neurontin settlement on my own, I came to realize there were many parallels between the off-label promotion of Neurontin and the sales practices fostered by Endo's management. This was also the first time that I came to learn about the False Claims Act and to understand that off-label marketing was a legal issue, not just an ethical issue.

11. My suspicions about whether Endo knew what it was doing was wrong were confirmed when I spoke with another sales representative, Kimberly Konopa, who said, "You know what they're doing is illegal, right?" Kimberly stated to me that, when she first

5

interviewed at Endo, her interviewing manager J.P. Brassil asked her if she was comfortable selling off-label.  This confirmed to me that Endo knew that what they were doing was considered off-label marketing and that it was improper.

12.     Once I came to the realization that Endo was likely violating the False Claims Act, I began gathering my personal documents so I would have evidence supporting the "red flags" that I was witnessing at the company.  I knew it was important for me to lay a documentary foundation when I talked to a lawyer about the case, so I gathered scorecards reflecting my increasing sales goals, call plans identifying the practice areas of the physicians I was required to contact, training manuals, Lidoderm sales materials which I was required to disseminate to physicians, restricted materials, and the corresponding restricted material logs where I was required to document the amount of off-label studies that I handed out to physicians.

13.     Accordingly, my contribution to the Government's recovery began with extensive prefiling research and obtaining, in the course of my employment, internal documents and information which demonstrated that Endo Pharmaceuticals knowingly and intentionally developed a marketing scheme with the sole focus of promoting Lidoderm off-label.

### FILING THE QUI TAM COMPLAINT

14.     In early 2005, I located the James, Hoyer, Newcomer & Smiljanich, P.A. ("James Hoyer") law firm via an internet search.  My research showed that James Hoyer had a nationwide False Claims Act practice with extensive experience representing the government and consumers in various types of fraud cases.  I was particularly drawn to the James Hoyer firm because of their strong focus on the investigative aspect of cases, including an investigative team headed by former FBI Agent and White Collar Crime Division Supervisor, Al Scudieri ("Scudieri").

15.     Once I decided to contact the James Hoyer firm, I met with Scudieri and attorneys John Newcomer and Christopher Casper to evaluate my allegations and discuss filing a False Claims Act case.  Scudieri explained to me the process of filing a False Claims Act case and the potential downsides of the case related to jeopardizing my professional career.  When I felt fully educated about the False Claims Act process, I decided to proceed with filing a case.  Scudieri also emphasized the importance of moving quickly at the outset of the case, so we worked very long hours for several weeks to prepare the initial complaint based on the information I had gathered and given to my attorneys.  With my consent, the original complaint was filed on July 5, 2005, in the Eastern District of Pennsylvania.

## PARTICIPATION IN THE GOVERNMENT'S INVESTIGATION

16.     On July 7, 2005, I had my first meeting with the government.  I met with Special Agent Mike Hensle of the Federal Bureau of Investigation and Lisa Girardi of the Department of Health and Human Services at the FBI's office in Syracuse, New York.  Before this meeting, I had never met with government agents.  In this meeting, I gave Hensle and Girardi details about my personal and professional background, the corporate and training structures at Endo, and provided a detailed explanation of the techniques that I had been instructed to sell on- and off-label.  I brought documents to the meeting showing Endo's sales and marketing materials, scorecards which outlined the rapidly-increasing quarterly product goals and expectations, the Restricted Materials Log where sales representatives were required to document the distribution of off-label materials, and call plans listing physicians who do not treat patients with PHN.  At this meeting, Hensle and Girardi asked if I would be willing to be "wired," meaning wearing a surreptitious recording device during meetings with Endo executives to obtain information regarding Endo's off-label marketing scheme.  Although I was tremendously anxious about the

7

prospect of being "wired," I agreed to do it to help the Government's investigation.   Hensle and

Girardi wanted to know if I had any way to get into the home office to record executives there.

Even though sales representatives do not normally ever go to headquarters, I had developed a

friendship with the Director of Marketing for Lidoderm, Deanne Melloy, when we were both on

the first trip to Japan.   Melloy and I had talked about possibly coming to "shadow" her at the

home office, so at the request of the Government, I agreed to reach out to Melloy and see if I

could schedule that shadowing.

17.     Right after filing the FCA complaint, I received my District Manager Gail

Pierce's schedule which showed that she would be coming to do a ride-along with me on August

1, 2005.  I notified Scudieri and he passed the information to the Government who immediately

requested that I get "wired" during the ride-along.  On August 1, 2005, I was "wired" for the first

time, as I wore a small rectangle recording device under my blouse.  The FBI prepared me for

how to use the device, including leaving the device on all day regardless of what events

transpired, how to perform the appropriate preamble and postamble, and how to complete the

recording at the end of the day.  Over a period of eight hours, I recorded Pierce coaching me on

various methods to sell Lidoderm off-label, including pushing Endo's "Put the Pain Where the

Patch Is" slogan through emphasizing the "mechanism of action" (a sales technique which

focuses on *how* Lidoderm works rather than *what* it is approved for in order to get physicians

thinking about possible off-label uses) technique.  One thing that stood out to me that day was

Pierce stating to one of my anesthesiology/pain management nurse practitioner clients that,

"There probably aren't too many body parts that doctors haven't used [Lidoderm] on."

18.     In September 2005, I was wired again to record a meeting led by Regional

Business Director and Specialty District Manager J.P. Brassil.  This "Plan of Action" was

8

particularly nerve-wracking for me because I was hiding the recording device on my body while surrounded by all of the specialty and pharma sales forces in the region, as well as the management team including Specialty District Manager Anthony Luongo and Pharma District Manager Joe Gaeta.  During the day-long recording, Brassil openly discussed off-label marketing techniques, including coaching representatives on how to initiate off-label discussion through leading and engaging questions.  During a lunch break, I asked Brassil about a comment he made during the presentation about Endo potentially being on the FDA's radar.  I recorded Brassil as he explained to me that we could be on their radar eventually due to, "The fact that we're a pain management company, the fact this is not a $40 million product any more.  It's a $400 million product…but 90% of our prescriptions come off label."  When Hensle reviewed the recordings from my meeting with Brassil, he stated, "This is the jackpot!"

19.     In addition to the recordings, I also began forwarding to the Government (through my counsel) any internal documents, emails and memoranda that I received in the normal course of my business while staying in my position at the company.  For example, in October 2005, I received an email to the specialty sales force from Ed Tell, the Lidoderm Product Manager, stating that we should, "Seize the opportunity that currently exists in the market.  First, drug safety continues to be an increased concern in the wake of the recent withdrawal of Vioxx and Bextra from the market." Vioxx and Bextra were not indicated for PHN, so their withdrawal from the market should have had no impact on Lidoderm.  However, both of the drugs were indicated for osteoarthritis and rheumatoid arthritis, which were very common off-label uses for Lidoderm, so their withdrawal from the market opened up a large opportunity to promote Lidoderm off-label to fill the gap.

20.     On November 3, 2005, I attended a formal relator's meeting with three representatives from James Hoyer, Hensle, Girardi, Ronald Houston of the Food & Drug Administration, AUSA Tom Capezza from the Department of Justice, AUSA Peg Hutchinson from the Eastern District of Pennsylvania, Dana Fink from New York Probation, and additional attendees by phone.  At this meeting, I reiterated the information that I had shared with Hensle and Girardi in July 2005, and brought more documentation to support the allegations, including more off-label studies, restricted material logs, call plans, evidence of honoraria paid to high-prescribing physicians, and evidence of rapidly-increasing sales goals.  At this meeting, we also discussed whether I was prepared to continue making covert recordings (I was) and whether a subpoena would be necessary (it was).  The meeting lasted approximately four hours and was my first indication that we had successfully gathered the attention of many different government agencies who were all interested in Endo's conduct.  I later learned that a multi-division Task Force was established shortly after this meeting to conduct an efficient investigation.

21.     From January 23 to 27, 2005, I attended the Endo National Sales Conference in Atlanta, Georgia.  I notified the Government of the trip before attending, and they gave me orders to be wired for various parts of the conference throughout the week.  In particular, I was directed to obtain a verbal commitment from Deanne Melloy to visit her in the home office, and to find out more information about why Endo required sales representatives to fill out restricted materials logs.  I accomplished and recorded both tasks on the third day of the conference.  I also recorded senior managers bragging about the extraordinary growth of Lidoderm and Endo as a company, and the goals to sell 140 million Lidoderm patches the following year (while the PHN population still remained stagnant at approximately 200,000 patients per year).  Ed Tell gave company-wide guidance to continue emphasizing Lidoderm's safety profile in the wake of the

Vioxx and Bextra withdrawals, and Director of Sales Training Nick Recchioni stated, "We should have more restricted materials soon.  We want to keep the organization safe, but allow us to push the limits."  I also recorded a conversation with Director of Corporate Accounts Mark Stanton where I questioned the high sales goals, and Mark stated, "It's really scary what you guys have to do."  On June 1, 2006, I met with Hensle, Capezza, AUSA Allison Barnes of the Eastern District of Pennsylvania, HHS-OIG agents Duane Susi and Steve Corns at the Albany FBI office for a debriefing meeting regarding all of the information obtained at the Atlanta meeting.

22.     After I confirmed the "shadowing" visit with Deanne Melloy in Atlanta, I followed up with her, at the request of Hensle, to schedule a two-day visit to the home office in Chadds Ford, Pennsylvania.  The Government assigned me with the task to "go down there (Chadd's Ford) and get an admission from an authoritative figure" as to the rampant off-label sales, as they were looking for the "dagger in the heart" and a "home run."  On April 20 and 21, 2006, I shadowed Melloy and recorded conversations where Melloy and other Endo executives openly discussed the percentage of Lidoderm sales paid for by the Government, and the percentage of Lidoderm sales known to be off-label (a staggering 97-98% per Bill Kellens, the Lidoderm Product Manager).  I also recorded Kellens talking about specific off-label ailments that Lidoderm was prescribed for, as well as the phenomenon of physicians writing increased prescriptions after attending advisory board and consultant meetings, and Melloy directing her assistant to send a new carpal tunnel study to all of the sales representatives even after the assistant reminded her that it wasn't approved for distribution.  (I received my copies of the study in May 2006 and provided them to the Government.)  One of the most significant developments in the investigation was when I attended the "2006 Situational Analysis Meeting"

presented by Senior Market Research Analyst Alex Arfaei, and obtained a copy of his corresponding PowerPoint presentation.  In the presence of Endo's senior management, Arfaei confirmed that low back pain and acute pain were driving the Lidoderm business, that less than 10% of Lidoderm prescriptions were for PHN, and that none of the drugs that Endo considered as Lidoderm's "competitive marketplace" were drugs targeted or approved for PHN.  This four-hour meeting gave the Government a candid, unfiltered view into Endo management's plans and perception of Lidoderm's off-label uses.

23.     On October 17, 2006, I met with Scudieri and agents from the FBI, FDA, and HHS, as well as AUSAs from the Northern District of New York at the Albany FBI office to discuss a subpoena to Endo that the FBI and HHS were planning to serve.  I provided the FBI and HHS with categories of documents to request in the subpoena, including who would be in possession of the most significant documents and where the documents would be located.  I specifically suggested that the following documents and reports be requested, as they would reveal very significant information and data: Call Plan Prescriber Sales Reports, (electronic) Call Notes, a comprehensive list including any and all honoraria paid to speakers and thought-leaders since the marketing of the Lidoderm patch began, Lidoderm Early View Reports (a raw-data snapshot of weekly Lidoderm prescriptions), Scorecards/Incentive Compensation Reports, Call Plan Prescriber Reports, Targeting Reports, Lidoderm Allocation Reports, Ranking Reports, Market Share and Market Growth Reports, "Train the Trainer" list of attendees since the inception of Lidoderm marketing, Pharma and Specialty Lidoderm Goals, and Restricted Material Logs for all sales representatives.  I also gave the Government detailed background information on all of the individuals who would be targeted for questioning during the raid.

Throughout the end of 2006 and early January 2007, I continued to meet and talk regularly with Hensle and Capezza to identify witnesses and documents to be subpoenaed.

24.     In advance of serving the subpoena and the Government's plan to conduct a raid and on-sight interviews of many of Endo's employees, I prepared a list of questions that the Government could use as an outline for the employee interviews.  I coded the questions as "S" for sales employees, or "M" for marketing employees, and also included questions specific to individual employees like J.P. Brassil.

25.     On January 16, 2007, I attended the Specialty East and Pharma East Plan of Action Meeting in Baltimore, Maryland.  Endo was also holding a simultaneous Plan of Action meeting for Specialty West and Pharma West in Los Angeles, California.   The Government scheduled the service of the subpoena and coordinated raids to coincide with the meetings so all employees would be assembled for immediate, extemporaneous interviews.  On January 16, 2007, at the advice of the Government, I hung-back in my hotel room while the Government's raid began.  I think the notes from my diary best capture the overwhelming experience of that day:

> Here, I sit in my hotel suite in a corner room.  All of the training sessions are over for the day, so I'm just enjoying my view from the 19th floor overlooking the beautiful Baltimore Harbor.  It is Tuesday, January 16, 2007 at 5:16 pm and it is one of the most beautiful sunsets I've ever witnessed.  When I think about it, in one sense everything seems so calm and perfect, but on the other hand, it's quite nerve-wracking, knowing that all hell is about to break loose since an FBI raid is planned for tonight.  The "first rounds" were all scheduled for 5:00 p.m. and Romaine, Karales, Cochran and Wickline were to be questioned by the FBI.  From what I understand, the entire lobby and foyer were extremely chaotic, as agents were swarming about and questioning all levels of Endo employees. … At 7:42 p.m., Chris Mulhall called me and indicated that the place is "buzzing" but just to hang in there, as he was waiting for a return call from Tom Capezza.  After the major raid was over, the lead FBI and HHS agents, Scudieri and Newcomer came up to my room, as they wanted to debrief and recap their findings.

Since then, I've often thought to myself…was this the best day or the worst day? In my opinion, it was the best day. I feel this was the day that served as the biggest turning point and provided the most validity to the claims I had brought to the Government more than a year earlier.

26.     At the direction of the Government, I was wired for portions of the Baltimore conference to record more examples of generalized instruction to the whole sales force regarding off-label marketing. However, I was not wired at 7:00 p.m. on January 17, 2007, when CEO Peter Lankau took the stage during an awards ceremony and announced that Endo had been served with a subpoena. Lankau was highly perturbed as he insisted, "This is a way for the government to make money!" He also stated, "We might just want to get this behind us…we just don't know yet." I recounted this and other parts of Lankau's speech to Hensle, Mulhall and other agents in a debriefing after the conference.

27.     Later, the FBI completed the transcripts of more than 200 hours that I'd recorded over a period of three years. The transcriptions amounted to more than 2,000 typed pages. I received all of the transcriptions and reviewed every one of the pages to correct portions of the conversations that the transcriptionist had not understood and had marked as "unintelligible." I also highlighted and notated significant conversations and key portions of the transcription for the Government to review. I estimate that I spent several hundred hours reviewing the FBI's transcriptions of my recorded conversations.

28.     On March 20, 2008, I had a conference call with Scudieri, Newcomer, James Hoyer attorney Elaine Stromgren, Capezza, Mulhall, and EDPA AUSAs Nicole Marks and Allison Barnes. This call was scheduled to see how I could assist the Government, because Endo had begun producing documents in response to the subpoena. As the Government's request, I

reviewed the categories of documents being produced and helped narrow the field of documents to assist in a more efficient document review.  For me, this task included setting up templates, searchable fields and parameters for Endo's Call Notes submissions.  In addition, I composed a list of approximately 25 exact terms and phrases to seek-out within the Call Notes.  I also agreed to sign an "Agreement Regarding Common Interest and Disclosure of Information" that was given to me by AUSA Nicole Mark so the Government could freely share the subpoenaed information with me.

29.     From 2008 through 2011, the active investigation slowed down a bit as some Government agents began rotating positions and the Government was reviewing the documents produced in response to the subpoena.  However, because I still remained in my job, I continued to acquire and produce internal documents that came to my attention reflecting the company's reaction to the subpoena and investigation.  For example, I gave the Government emails where Endo outwardly implemented systems to minimize off-label marketing (such as prior-authorization requirements in New York), but internally made statements indicating that business was expected to continue as usual (such as District Manager Brian Boccaccio responding to the prior-authorization requirement by saying, "We are going to recover this business.").  I also captured and turned over corporate-wide voicemails from senior management discussing employees who had been terminated as a result of Endo's internal off-label investigation, though I shared with the Government my opinion that the 11 terminated employees were simply scapegoats for the bigger corporate issue.

30.     Communication with the Government became more difficult and less of a two-way street starting around 2010.  Although I continued to provide the Government with all documents and information that seemed relevant, I felt as though I was receiving less feedback

about what the Government was doing with the information to hold Endo liable for their conduct.

I believe the primary reason for the stalled investigation was the significant amount of turn-over

of agents assigned to the case.  As far as I was aware, the following people were responsible for

all or part of the investigation from the time I filed the case until the time it settled: Chris

Mulhall, Mike Hensle, Tom Capezza, Lisa Girardi, Ron Houston, Dana Fink, Nicole Mark,

Allison Barnes, Duane Susi, Sarah Lord, Grant Jacquith, Peg Hutchinson, and Brian McCabe.

There may well be others, but these are the people I recall meeting with or talking to about the

case.

31.     In late 2011, I talked to my counsel at James Hoyer and we were concerned that

the case was stalling because so many new people had come on and were not aggressively

moving it forward the way they had been doing at the beginning of the case.  In order to help the

current agents and prosecutors get reacquainted with the case and the incredibly blatant off-label

marketing at Endo, I took time off from work and traveled to Florida for three days in January

2012 to review documents, review elements of the complaint, and to be interviewed and filmed

by Angie Moreschi and Chad Soriano of the James Hoyer firm for a documentary-style video

production about the case.

32.     On March 1, 2012, I met with Sarah Lord at the James Hoyer office in Tampa,

Florida.  Lord was an experienced AUSA who was recently assigned to the case who told us that

there was an "important meeting" with the Department of Justice, EDPA and Endo's legal team

scheduled for March 13, 2012, and she wanted to meet with me and my team prior to that

meeting.  Another FBI Agent named Mike Brady also attended the meeting, and Mulhall

appeared by phone for portions of it.  At that meeting, we instructed Lord on the procedural

16

history of the case using the James Hoyer firm's Genu website and the documentary video produced by the James Hoyer media team.

33.     In May 2012, I started to feel sick, suffering from a near-constant severe migraine headache and general weakness.  I went on medical leave that month, hoping to return to work once my health improved.  During that time, even though I was not formally working as a sales representative, I continued to receive company emails, newsletters, voicemails and other communications, which I passed on to the Government to aid in the investigation.  I was ultimately unable to return to work and formally resigned in November 2013.  Although chronic Lyme disease is clearly not attributable to my role as a relator, my medical doctor told me that constant stress weakened my body's ability to fight the illness.

34.     The past nine years have been the most stressful, scary, exhausting years of my life.  The Government told me that I could talk to my husband, Casey, about the case, so he was the only person I ever told about the case.  I am extremely close to my parents, sisters, and brother, and had to lie to them for years about my job and my whereabouts when traveling for meetings with my lawyers or the Government.  I had to look directly in the face of my colleagues and close friends and lie when they talked about who they thought was responsible for the investigation of Endo.  I knew it would all come out when the case was unsealed.  I knew I might be called to be the Government's witness at trial, so I mentally prepared myself for that.  Although I did not have to testify at trial, my name was revealed when the case was unsealed.  I have received mixed responses from my former colleagues – some are proud of me for going forward with the case, but others think I just ratted out the company for the money.  I still have not told my family about the case because I fear how they will react when they find out I have been lying to them and keeping something like this hidden for nine years.

17

35.     Throughout this case, I acted affirmatively to ensure that the Government had all of the information it needed to establish Endo Pharmaceutical's False Claims Act liability for off-label marketing; made sure the case did not get set aside as a result of the rotating Government agents; and provided all of the information to establish the level of damages caused by Endo's off-label marketing.  I hired able counsel to aid me in the process of bringing the case and pushing it forward, and I took my role as a Relator extremely seriously for all nine years of this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ___15th___ day of November, 2014, at Syracuse, NY

Peggy Ryan

18