## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al., ex rel. PEGGY RYAN, | : : : | CIVIL ACTION |
| Plaintiff, | : : | |
| v. | : : | No. 05-3450 |
| ENDO PHARMACEUTICALS, INC., | : : | |
| Defendant. | : : | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al., ex rel. MAX H. WEATHERSBY, | : : : | CIVIL ACTION |
| Plaintiff, | : : | |
| v. | : : | No. 10-2039 |
| ENDO PHARMACEUTICALS, INC., | : : | |
| Defendant. | : : | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al., ex rel. GURSHEEL S. DHILLON, | : : : | CIVIL ACTION |
| Plaintiff, | : : | |
| v. | : : | No. 11-7767 |
| ENDO PHARMACEUTICALS, INC., | : : | |
| Defendant. | : | |

### MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                                           **JULY 15, 2015**

Presently before this Court are Relator, Peggy Ryan's ("Ryan"), "Motion for Relator's Share Award," the Response in Opposition filed by the United States of America (the "Government"), and Ryan's Reply thereto. For the following reasons, Ryan's Motion is granted.

**I.     BACKGROUND**

Due to the extensive factual background of this litigation, which has been recounted in the previous Memorandum Opinions of this Court, we address solely the facts underlying Ryan's instant Motion.[1] This litigation emanated from three separate *qui tam* actions filed by Relators, Ryan, Max Weathersby ("Weathersby") and Gursheel S. Dhillon ("Dhillon"), alleging that Endo Pharmaceuticals, Inc. ("Endo") violated the False Claims Act ("FCA") when it promoted the drug Lidoderm for uses that were neither approved by the Food and Drug Administration nor medically accepted, thus causing false claims to be submitted to federal healthcare programs. This is commonly known as off-label marketing and is prohibited by federal statutes and regulations. See 21 U.S.C. § 355 (a) & (d); 21 U.S.C. § 331(d).

After a lengthy investigation, which was initiated after Ryan's filing of the *qui tam* Complaint on July 5, 2005, the Government elected to intervene on behalf of the Relators for settlement purposes on February 21, 2014. (See Gov't's Not. of Election to Intervene, Feb. 21, 2014.) On this same day, the Relators entered into a Settlement Agreement, whereby Endo agreed to pay approximately $171.9 million to resolve the violations of the FCA. (See Gov't's Mem. on the Eligibility of Relators, at 1.) Endo paid $139,967,038 to the Government out of these settlement proceeds. (See Gov't's Resp. in Opp'n to Ryan's Mot. for Relator's Share Award, at 2.)

After extensive briefing by the Government and the parties, we held that Ryan, as the first relator to file claims against Endo, was the sole relator eligible to recover the funds attained through the Settlement Agreement. (See Order, June 23, 2014.) In an effort to collect these funds, Ryan filed a Motion for Relator's Share Award on November 18, 2014. (See Ryan Mot.

---

[1]The full factual background for this litigation can be found at United States ex rel. Ryan v. Endo Pharmaceuticals, Inc., No. 05–3450, 2014 WL 2813103 (E.D. Pa. June 23, 2014).

for Relators Share Award, at 3.)  In this Motion, Ryan argues for a 24% share of the total federal recovery.  (Id.)  In a Response in Opposition, filed on January 16, 2015, the Government disputes Ryan's figure and contends that she should not receive more than a 19% share of the award.  (See Gov't's Resp. in Opp'n, at 2.)

Before the Court could determine the appropriate share award, we received notice of an appeal filed by Dhillon with the United States Court of Appeals for the Third Circuit ("Third Circuit"), which required the Court to enter a Stay on the instant issue.  (See Doc. Nos. 32, 64.)  On June 11, 2015, the Third Circuit filed an Opinion denying Dhillon's appeal and affirming our finding that Ryan was the sole relator eligible to receive any proceeds of the settlement award.  See United States of America ex rel. Gursheel Dhillon v. Peggy Ryan, No. 14-3377, at *2 (3d Cir. June 11, 2015).  In recognition of the disposition of Dhillon's appeal, we now order that the stay be removed, and proceed to determine the legally suitable share award for Ryan.

## II.  STANDARD OF LAW

Congress enacted the FCA for the purpose of protecting government funds and property from fraudulent claims.[2]  See Rainwater v. United States, 356 U.S. 590 (1958).  In essence, the FCA is an avenue "to provide for restitution to the government of money taken from it by fraud." United States ex rel. Marcus v. Hess, 317 U.S. 537, 551 (1943).  The FCA accomplishes this goal by authorizing civil penalties against anyone who "knowingly presents or causes to be

---

[2]The FCA was enacted in 1863 during the American Civil War to combat the "rampant fraud" being perpetrated by defense contractors against the government.  United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 1153 (3d Cir. 1991).  Elaborating on the birth of the FCA, the United States Supreme Court noted that, "the False Claims Act was originally adopted following a series of sensational congressional investigations into the sale of provisions and munitions to the War Department. Testimony before Congress painted a sordid picture of how the United States had been billed for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war.  Congress wanted to stop this plundering of the public treasury.  At the same time it is equally clear that the False Claims Act was not designed to reach every kind of fraud practiced on the Government."  United States v. McNinch, 356 U.S. 595, 599 (1958).

presented, a false or fraudulent claim for payment," and/or "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A) & (B). The FCA allows civil suits to be brought by either the Government or by private plaintiffs in order to recover funds lost through false claims. 31 U.S.C. § 3730(a) & (b). A suit brought by a private plaintiff, known as a "relator," on behalf of the government is called a *qui tam* action.[3] When a relator brings a *qui tam* action, the Complaint is initially filed under seal and served upon the government, and the government may then elect to intervene and proceed with the action. 31 U.S.C. § 3730(a). If the government chooses not to intervene, the relator has the right to conduct the action on his or her own. 31 U.S.C. § 3730(c)(3). In either case, if a *qui tam* action results in a recovery, the proper relator is entitled to a share of the award. 31 U.S.C. § 3730(d).

Congress has directed in the FCA that the amount received by the relator is to be apportioned according to a set of percentage ranges of the overall award. Id. Where the government intervenes and prosecutes the action, the relator shall receive "at least fifteen percent but not more than twenty five percent of the proceeds of the action or the settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action." 31 U.S.C. § 3730(d) (1). Although Courts have used varying criteria to determine the appropriate percentage, the sole factor annunciated by Congress is "the extent to which the person substantially contributed to the prosecution of the action." Id.

---

[3]In Latin, the phrase *qui tam* is short for "*qui tam pro domino rege quam pro se ipso in hac parte sequitur*," which translates as, "who pursues this action on our Lord the King's behalf as well as his own." United States ex rel. Atkinson v. Pa. Shipbuilding Co., 473 F.3d 506, 509 n. 1 (3d Cir. 2007) (quoting Vt. Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 769 n.1 (2000)); see also Black's Law Dictionary (9th ed. 2009). Thus, a *qui tam* action permits private parties to bring suit to enforce the law on the Government's behalf and rewards successful plaintiffs with part of the recovery. United States ex rel. Zizic v. Q2Administrators, LLC, 728 F.3d 228, 231 n.1 (3d Cir. 2013) (quoting United States ex rel. Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 647 n.1 (D.C. Cir. 1994)).

### III.   DISCUSSION

The current juncture is the last stop in a long and tedious litigation. The lone remaining issue to be decided by the Court is the percentage that Ryan should receive from the settlement award. Since the Government intervened to prosecute the FCA claims against Endo, 31 U.S.C. § 3730(d)(1) controls, which positions Ryan's share at between fifteen and twenty five percent of the overall settlement award. 31 U.S.C. § 3730(d)(1). It is evident from the filings that the parties agree on this range; however, they diverge greatly on the exact percentage to which Ryan is entitled.

Ryan argues that she is entitled to a 24% share of the total federal recovery due to her significant contributions in the settlement of the action. (Ryan Mot. for Relators Share Award, at 3.) The Government does not agree, instead contending that Ryan should not receive more than a 19% share of the award. (See Gov't's Resp. in Opp'n, at 2.) The Government argues that the downgrade is necessary for two distinct reasons. First, the Government contends that Ryan's participation does not warrant the higher percentage. (Id. at 6.) Next, it is the Government's position that since the settlement award is large, a smaller relator's share is warranted. (Id. at 11.) In response, Ryan counter-argues that the Government's "characterization of Ryan's contributions to the Government's investigation is largely inaccurate," and that its position is "sorely lacking in legal support." (Ryan Mot. for Relators Share Award, at 1.)

#### A.   *The Contributions of Peggy Ryan to the Settlement of the FCA Violations*

Under the statutory framework of § 3730, the appropriate share determination hinges on the extent to which Ryan "substantially contributed to the prosecution of the action" against Endo. 31 U.S.C. § 3730(d)(1). An examination of the record exhibits that Ryan provided not only the spark for the investigation, but that she nurtured the flame at the darkest times when the

5

possibility of a favorable outcome seemed most remote. Throughout the nine year period from her first *qui tam* Complaint in 2005 to the settlement in 2014, Ryan continually provided access behind the corporate walls of Endo. Ryan's insider status, conferred by her employment with Endo, enabled the Government investigatory team to recover evidence which would have otherwise been unobtainable.

The following is a summary of Ryan's contributions. In July 2005, the investigation into the fraudulent practices of Endo was initiated after Ryan filed a *qui tam* Complaint. (See Ryan Compl.) Over the next three years, Ryan wore a wire to surreptitiously record over two hundred (200) hours of conversations. (Ryan Mot. for Relator's Share Award, 16.) These recordings were aimed at uncovering the unlawful marketing of Lidoderm for off-label uses.

As evidenced by the following, Ryan was successful in procuring direct evidence of an organizational strategy to market Lidoderm for off-label uses. During eight hours of meetings with a District Manager in 2005, the Manager directed Ryan on how to use certain phrases to promote Lidoderm for off-label uses. (Id. at 13.) At another meeting in 2005 with members of Endo's upper management and its sales force, Ryan captured managers instructing the sales representatives on how to engage physicians in order to promote Lidoderm for off-label uses. (Id.) Specifically, Ryan recorded a Specialty District Manager declaring that 90% of Lidoderm's prescriptions were for off-label uses. (Id.)

In 2006, Ryan recorded a two day session with Endo's Senior Director of Marketing at Endo's corporate headquarters in Chadds Ford, Pennsylvania. (Id. at 14.) At this meeting, Ryan recorded valuable evidence including Endo's Lidoderm Product Manager stating that 97-98% of Lidoderm's prescriptions were off-label. (Id.) Furthermore, this session led to Ryan being invited to a situational analysis meeting with a Senior Market Research Analyst. (Id. at 15.)

Ryan recorded this meeting and provided the Government with the powerpoint slides confirming that Lidoderm was being marketed for off-label uses. (Id.)

As the damaging evidence from Ryan's surreptitious recordings mounted, the Government began to prepare a subpoena to issue to Endo in order to obtain additional documents and information. (Id.) On October 17, 2006, the Government met with Ryan to discuss the pending subpoena. (Id.) The impetus for this meeting was the Government's need for Ryan's insider knowledge of Endo in order to better tailor the subpoena to target relevant evidence. (Id.) Ryan complied, and provided specific information regarding categories of documents including: who would be in possession of the most significant documents; where the documents would be located; potential witnesses who should be interviewed after the subpoena was served; and targeted questions to be asked of the sales and marketing forces during the interviews. (Id.) After the Government served the subpoena, Ryan continued to provide assistance to the investigation by reviewing the responsive documents submitted by Endo to help narrow the scope of the investigation and target the most relevant information. (Id. at 16.)

In addition to the hours of incriminating recordings, Ryan provided a bounty of documentary evidence including: Endo's promotional sales materials; off-label studies; restricted materials logs which recorded the amount of off-label material provided physicians; and Endo created call plans requiring sales representatives to promote Lidoderm to physicians for off-label uses. (Id. at 12.)

Finally, as the investigation began to lag in 2010, Ryan and the James Hoyer firm, the law firm representing her in this action, produced an eighteen (18) minute documentary video summarizing the case, the evidence, and the damages caused by Endo's ongoing conduct. (Id. at 19.) This video was then distributed to every agent and prosecutor known to be involved in the

case.  (Id.)  After the case was unsealed, the documentary was given to Endo to provide visual evidence of the magnitude of the case against them.  (Id.)

Overall, Ryan spent hundreds of hours supporting the Government's investigation. Throughout the lengthy investigation, Ryan accumulated evidence from otherwise unobtainable sources at the senior management level of Endo.  In light of the nature and abundance of her contributions, it is clear that Ryan was indispensable to the investigation.  In fact, it is the view of the Court that without the assistance of Ryan, the probability of the Government recovering any funds for the FCA violations would have been slim at best.

The Government's position minimizes the aforementioned contributions of Ryan in arguing that the relator's share should be no more than 19% of the overall settlement award. (Gov.'s Resp. in Opp'n, 1.)  As such, the Government contends that Ryan's contributions, although helpful and undisputed, were not extraordinary.  (Id. at 6.)  Rather, the Government touts the significance of its own involvement in arguing that Ryan's "contributions, while real and substantial, did not ultimately comprise 50 percent of the overall investigation."  (Id. at 9.) The Government takes specific umbrage with the fact that the case did not go to trial, and argues that "[t]o grant a relator 24 percent of a settlement regardless of when the case settles would leave the relator who must go through a trial, with all of a trial's attendant demands, with less incentive to cooperate fully throughout."  (Id. at 10.)

Although the Court recognizes the substantial role played by the Government in this FCA action, we believe that the Government's downplaying of Ryan's role is unjustified.  Ryan was the initiator of the action, and, in the eyes of the Court, Ryan played a vital role throughout the investigation.  In addition, we find the Government's argument that Ryan's share should be lowered since the matter did not proceed to trial, to be counter-intuitive and without statutory

support. Applying the Government's argument to cases like this would punish a relator, such as Ryan, for providing a level of incriminating information that would make the defendant's prospects of winning at trial less likely. In essence, a relator would have to be wary of providing too much evidence since this could prevent the garnering of a larger share because the defendant chose to settle. Furthermore, the statute, by explicitly awarding a different range of percentages based upon whether the Government intervenes or not, compels the logical conclusion that Congress has already included the costs of Government intervention within the statute. See 31 U.S.C. § 3730(d)(1) & (2). Finally, the Government's position fails to take into account the resources it saved in not having to litigate the claims at trial. For these reasons, we find that the contributions of Peggy Ryan to the settlement of the FCA claims supports her argument for a share award of 24%.

### B.     *The Size of the Settlement Award*

The Government next argues that the considerable size of the settlement award warrants that Ryan receive a smaller share. (Id. at 11.) In support, the Government cites to the passage in § 3730(d)(1) which states that a relator is entitled to a share "depending upon the extent to which the [relator] substantially contributed to the prosecution of the action." (Id.) The Government urges that this passage cannot be understood in a vacuum, but, rather, it must be understood in relation to the overall purpose of the act, which is to provide incentives to whistleblowers to come forward. (Id.)

We reject the Government's argument for several reasons. First, the Government's interpretation is contrary to the explicit language of the statute. The Court reads the statute to hold that the only measuring stick is the contribution of the relator. If Congress had intended limitations, like in the case of large awards, it would have explicitly included them within the

statutory framework of the FCA. Congress' silence on this issue compels rejection of the Government's argument. Second, the Government has failed to include any legal precedent affirming this argument, and thorough research by this Court has failed to unearth any such support. However, in United States ex rel. Merena v. SmithKline Beecham Corp., 52 F. Supp. 2d 420, 434 (E.D. Pa. 1998), *rev'd on other grounds*, 205 F. Supp. 3d 97 (3d Cir. 2000), this argument was explicitly denied. See also United States ex rel. Johnson-Porchardt v. Rapid City Reg'l Hosp., 252 F. Supp. 2d 892, 903 (D.S.D. 2003) (citing United States ex rel. Alderson v. Quorum Health, 171 F. Supp. 2d 1323, 1335 n.37 (M.D. Fl. 2001)). For these reasons, we reject the Government's argument that the substantial size of the settlement necessitates a smaller share for Ryan.

## IV.   CONCLUSION

For the above mentioned reasons, we conclude that Ryan's contribution to the recovery of the funds for the FCA violations can be labeled as nothing short of extraordinary. As such, we find that the 24% share sought by Ryan is warranted, and we hold accordingly.

An appropriate Order follows.